UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Noel C.,

     Plaintiff,

     v.                                       Civil Action No. 2:18–cv–127

Commissioner of Social Security,

     Defendant.

## OPINION AND ORDER
(Docs. 13, 14)

Plaintiff Noel C. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for disability insurance benefits. Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc.13), and the Commissioner's motion to affirm the same (Doc. 14). For the reasons stated below, Plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and the Commissioner's decision is AFFIRMED.

## Background

Plaintiff was 45 years old on her alleged disability onset date of December 24, 2015. She completed high school and attended two years of college, receiving a certificate in radiologic technology. (AR 30.) She has worked as a licensed optician at a doctor's office, a radiographer/x-ray technologist at Springfield Hospital and Rutland Hospital, a medical assistant at Vermont Orthopedic Clinic, and a durable

medical equipment supervisor at Rutland Pharmacy.  (AR 31, 249–53.)  She stopped

working on December 24, 2015, after injuring her back on the job, while transferring

a patient from a stretcher to an x-ray table.  (AR 32, 44–45, 256.)

Plaintiff suffers from pain in her thoracic spine (upper back and abdomen),

resulting in radicular pain and a burning/pulling feeling from her back around to her

chest, ribs, and abdomen.  (AR 32, 35–36, 45.)  She also suffers from daily headaches

and pain in her shoulder, right hand, and left arm.  (AR 37–38, 49.)  She has

consulted with several neurosurgeons regarding whether surgery would alleviate her

thoracic pain but has been advised that the risks would likely exceed the potential

gains.  (AR 39–40; *see* AR 330–31, 586–87, 828; *but see* AR 614.)  Though she has

benefitted from injections and medication including muscle relaxers and Oxycodone,

she still suffers from constant pain, poor sleep, and limited mobility.  (AR 40, 42.)  In

addition, Plaintiff has been diagnosed with celiac disease, which is "a disease . . .

characterized by sensitivity to gluten, with chronic inflammation and atrophy of the

mucosa of the upper small intestine" and manifesting in diarrhea, nutritional and

vitamin deficiencies, and failure to thrive, *Stedmans Medical Dictionary* 253500

(Westlaw 2014); and with Hashimoto's thyroiditis, which is an autoimmune disease

that causes hypothyroidism, defined as "[d]iminished production of thyroid hormone,

leading to clinical manifestations of thyroid insufficiency, including low metabolic

rate, tendency to gain weight, somnolence, and sometimes myxedema," *id.* at

*Stedmans* 431070.  (AR 47.)

On a typical day during the alleged disability period, Plaintiff drove her

teenage son to and from school, took her various pain medications, watched

television, completed light household chores (in small steps and taking breaks, and sometimes with the help of her adult daughter), checked email, surfed the internet, read novels and medical journals, talked on the telephone, took naps, prepared and ate simple meals, and went grocery shopping with her sister (making frequent stops). (AR 33, 48, 76–83; *see* AR 259–61.)  At times, Plaintiff has flares of pain that immobilize her, and she is unable to get out of bed for over an hour.  (AR 40.)  She does not sleep well due to her pain, sleeping only four hours at a time most nights (AR 42, 48–49), and she has to change positions frequently to avoid "intense achiness" (AR 44; *see* AR 43).

On January 12, 2016, Plaintiff filed an application for social security disability insurance benefits.  Therein, she alleged that, starting on December 24, 2015, she has been unable to work due to "[t]horacic spine herniation," "[c]ervical spine [degenerative disc disease]," and "[s]evere celiac disease."  (AR 237.)  She added at the administrative hearing that she also has "digestive issues," leading to a diagnosis of celiac disease; and she has been diagnosed with Hashimoto's thyroiditis.  (AR 47.)  She explained that she is unable to work largely due to her need to take breaks (and naps) as a result of her impairments, making her reliability an issue.  (AR 50–51.)  Plaintiff's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.

The hearing was conducted on May 17, 2017 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 26–57.)  Plaintiff appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  On July 19, 2017, the ALJ issued a decision finding that Plaintiff was not disabled

under the Social Security Act at any time from her alleged disability onset date through the date of the decision.  (AR 10–21.)  Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted her administrative remedies, Plaintiff filed the Complaint in this action on August 7, 2018.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. § 404.1520(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. § 404.1520(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. § 404.1520(e), 404.1545(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §

404.1520(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. § 404.1520(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 24, 2015. (AR 13.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and thoracic spines, and celiac disease. (*Id.*) Conversely, the ALJ found that Plaintiff's "other diagnoses," including her cardiac condition, were non-severe. (AR 13–14.) The ALJ noted, however, that he "reviewed and considered" all of Plaintiff's impairments, both severe and non-severe, in formulating the RFC. (AR 14.) At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–15.) Next, the ALJ determined that Plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Plaintiff] can lift and carry 50 pounds occasionally and 25 pounds frequently. She can stand and walk for 6 hours and sit for 6 hours in an 8-hour workday. She has unlimited use of her hands and feet to operate controls, push, and pull. She can occasionally climb ladders, ropes, and scaffolds. She can frequently crawl. She can perform the remaining

postural activities on an unlimited basis. She has no manipulative limitations. She should avoid concentrated exposure to vibration, unprotected heights, and moving mechanical parts. She requires the ability to shift positions as necessary to relieve discomfort, no more than five minutes per hour.

(AR 15.) Given this RFC, the ALJ found that Plaintiff was capable of performing her past relevant work as a medical technician and a sales representative. (AR 21.) The ALJ concluded that Plaintiff had not been under a disability from her alleged disability onset date of December 24, 2015 through the date of the decision. (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether

"substantial evidence" exists in the record to support such decision.  42 U.S.C. §

405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*,

904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support

either position, the determination is one to be made by the factfinder.").  "Substantial

evidence" is more than a mere scintilla; it means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.  *Richardson v.

Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the

court should bear in mind that the Social Security Act is "a remedial statute to be

broadly construed and liberally applied."  *Dousewicz v. Harris*, 646 F.2d 771, 773

(2d Cir. 1981).

## Analysis

Plaintiff argues that the ALJ made four principal errors: (1) failing to consider

Plaintiff's Hashimoto's thyroiditis in his decision; (2) determining that Plaintiff has

the RFC to perform medium work based on an improper analysis of the medical

opinions; (3) failing to call a medical expert at the administrative hearing; and

(4) finding that Plaintiff failed to establish a correlation between her allegations and

the objective medical evidence.  (Doc. 13.)  The Commissioner responds by asserting

that substantial evidence supports the ALJ's decision and the decision is free of legal

error.  (Doc. 14.)

## I.     ALJ's Consideration of Plaintiff's Hashimoto's Thyroiditis

Plaintiff first argues that the ALJ erred by failing to consider Plaintiff's

Hashimoto's thyroiditis (sometimes referred to herein as simply "thyroiditis"), which

Plaintiff contends was a severe impairment during the alleged disability period.

(Doc. 13 at 4–7.)  The Commissioner counters that the ALJ did in fact consider the effects of Plaintiff's thyroiditis, given the ALJ's statement in his decision that he "reviewed and considered all 'severe' and 'non-severe' impairments in formulating [Plaintiff's RFC]."  (AR 14; *see* Doc. 14 at 4.)

It is the claimant's burden to show at step two that she has a "severe" impairment or combination of impairments, meaning an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(c); *see* 20 C.F.R. § 404.1522, "for a continuous period of at least 12 months," 20 C.F.R. § 404.1509.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").  "[T]he standard for a finding of severity . . . is *de minimis* and is intended only to screen out the very weakest cases."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).  An impairment is "not severe" when medical evidence establishes "only a slight abnormality . . . [,] which would have no more than a minimal effect on [the claimant's] ability to work."  SSR 85-28, 1985 WL 56856, at *3 (1985); *see* SSR 96-3P, 1996 WL 374181, at *1 (July 2, 1996).

Importantly, the ALJ's omission of an impairment at step two does not in and of itself require remand and may be deemed harmless error.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (applying

harmless error standard in social security context, and holding that, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration").  This is particularly true where the disability analysis continued and the ALJ considered all of the claimant's impairments in combination in his RFC determination.  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding alleged step-two error harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d Cir. 2010) (same).

Applied here, even if the ALJ erred in failing to explicitly consider and find Plaintiff's Hashimoto's thyroiditis severe, the error was harmless for several reasons.  First, the ALJ continued the disability analysis past step two and accounted for all of Plaintiff's relevant impairments in combination in his RFC determination.  (*See* AR 14–21.)  Second, Plaintiff did not include thyroiditis in her application for benefits, listing only thoracic spine herniation, cervical spine degenerative disc disease, and celiac disease.  (AR 237.)  Nor did Plaintiff state at the administrative hearing that thyroiditis was one of her disabling conditions; rather, she testified that, as of her alleged disability onset date, she was limited by her back pain, and "radicular symptoms into [her] extremities, and across [her] abdomen and . . . chest, ribs[,] and sternum."  (AR 32; *see* AR 35–38.)  The only mention Plaintiff made of her thyroid issues at the hearing was her statement that, in September 2015, she was "diagnosed with Hashimoto's," as well as celiac disease.  (AR 47.)  *See Shields v. Chater*, No. 94-CV-0210E(H), 1995 WL 819037, at *11 (W.D.N.Y. May 16, 1995) ("It is clear that the [Commissioner] does not commit legal error by failing to consider an

impairment that (1) was not indicate[d] by plaintiff on her application for disability or (2) alleged at the administrative hearing, and (3) of which the plaintiff provided no objective or subjective evidence.").

Third, and most importantly, the medical evidence demonstrates that Plaintiff's Hashimoto's thyroiditis did not significantly limit her ability to engage in basic work activities for a period of at least 12 months, which might explain why the record contains no medical opinion discussing the condition. Even Plaintiff's primary treating medical source, Susan Dumas, APRN (Advanced Practice Registered Nurse), did not mention Hashimoto's thyroiditis or any other type of thyroid condition in her April 2017 Medical Opinion regarding Plaintiff's work limitations. (*See* AR 825–27.) The medical treatment notes reflect that Plaintiff's thyroiditis was being effectively treated during the alleged disability period. Specifically, on October 12, 2015, approximately two months before the alleged disability period began, Dr. Douglas Dier noted in a consultation note that Plaintiff "was recently diagnosed with autoimmune thyroiditis and has been on thyroid replacement [medication] now for approximately [three] weeks." (AR 318.) Dr. Dier recommended that Plaintiff "[c]ontinue titration of thyroid medication" and take ibuprofen for "[s]ymptomatic therapy." (AR 319.) About two weeks later, a Rutland Regional Medical Center provider stated in an October 29, 2015 treatment note that Plaintiff "was just recently diagnosed with Hashimoto's and thyroid disease, and just recently started on thyroid medication[;] and [she] says that already some of the diffuse achiness and fatigue is starting to get better." (AR 427.) On December 7, 2015, Plaintiff visited with APRN Dumas, who noted Plaintiff's "Hashimoto[']s/hypothyroid" and recorded

10

that Plaintiff was "improved" but with still "room for improvement." (AR 674.)
Dumas explained that Plaintiff "needs to be very careful of all forms of gluten in
order to control [her] [H]ashimoto[']s, [and] to look at shampoos, lotions[,] and all
[over-the-counter] medications." (*Id.*)

It appears from the record that APRN Dumas was the only provider who
Plaintiff saw for her thyroiditis. When Plaintiff visited with her on March 2, 2016,
the condition was not discussed, although Plaintiff noted significant improvement in
her celiac symptoms—reduced pain, fatigue, and mental fog—after committing to a
"totally gluten free" diet. (AR 447; *see also* AR 449 ("has started to feel better since
she started eating gluten free," "[c]eliac tremendous improvement since [eating]
gluten free").) In late June 2016, Plaintiff started eating gluten again (AR 458), and
within a month, she reported feeling fatigued with "poor exercise tolerance" and
possible increase in thyroid symptoms (AR 761 ("Hashimoto[']s may be acting up")).
A few months later, in September, APRN Dumas recorded that Plaintiff's
Hashimoto's thyroiditis was "out of control[]" based on lab results (AR758), and again
advised Plaintiff to "adhere to a gluten free diet" (AR 759). Plaintiff herself told
Dumas at that appointment that eating gluten had "contribut[ed] to her pain."
(AR 762.) By January 2017, Plaintiff once again had stopped eating gluten resulting
in "better control of [her] pain" though she still felt "poor" overall. (AR 787.) In
April 2017, APRN Dumas recorded that Plaintiff was "eating cleaner" and her
thyroiditis was "stable." (AR 804.)

Accordingly, the record fails to document a 12-month period of significant
symptoms from Hashimoto's thyroiditis. Moreover, no medical provider (including

11

Plaintiff's primary care provider) opined that the condition significantly limited Plaintiff's activities during the alleged disability period. Therefore, the ALJ's failure to explicitly discuss the condition in his decision was at most harmless error.

Plaintiff contends that two nonexamining agency consultants found, at the initial and reconsideration levels of review, that Plaintiff's Hashimoto's thyroiditis was severe; and the ALJ should have followed suit. (Doc. 13 at 6; *see* AR 136, 150.) But those consultants' opinions were made in May and July 2016, respectively, before Plaintiff's thyroiditis stabilized. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether agency consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record). And where, as here, the opinions of a nonexamining agency consultant are not supported by and consistent with the record as a whole, the ALJ is not obligated to adopt them. *See* 20 C.F.R. § 404.1527(c)(3), (4).

## II.    ALJ's RFC Determination

Next, Plaintiff argues that the ALJ erred in determining that Plaintiff had the RFC to perform medium work during the alleged disability period. (Doc. 13 at 7–12.) The regulations provide that a claimant's RFC is "the most [she] can still do despite [her] limitations," and that the ALJ will assess a claimant's RFC "based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). "In general," it is the claimant and not the ALJ who is "responsible for providing the evidence . . . use[d] to make a finding about [her] [RFC]." *Id.* at (a)(3); *see* 20 C.F.R. § 404.1512(a)(1) ("You must inform us about or submit all evidence known to you that

relates to whether or not you are . . . disabled."); *Butts*, 388 F.3d at 383 (claimant bears burden of proving case at steps one through four).

Here, the ALJ determined that Plaintiff had the RFC for "medium work," with limitations, including a need to "shift positions as necessary to relieve discomfort, [for] no more than five minutes per hour." (AR 15.) This determination was based on the ALJ's explicit consideration of Plaintiff's hearing testimony, her daily activities, treatment notes from her various treating providers, objective medical evidence including MRI results, and the assessments of two nonexamining agency medical consultants. (AR 15–21.) Based on this evidence, the ALJ found insufficient support for Plaintiff's allegations of limitation, explaining:

> The objective evidence in this claim falls short of demonstrating the existence of pain and limitations that are so severe that [Plaintiff] cannot perform any work on a regular and continuing basis. [Plaintiff] testified to an extremely limited range of functional abilities. However, the objective medical evidence of record does not fully support those allegations. Therefore, because [Plaintiff] has failed to establish a correlation between the allegations and the objective medical evidence, [I] find[] [Plaintiff's] symptom[s] are not supported to the extent alleged.

(AR 16.) Focusing on the lack of objective medical evidence supporting Plaintiff's claims, the ALJ further stated: "Treatment notes overall show that while [Plaintiff] does have an abnormality of the thoracic spine, she continues to have neurological functioning that is largely intact and no deficits that would warrant restrictions beyond th[e] [RFC] listed [herein]." (AR 17.)

After a review of the record, the Court finds that substantial evidence supports the ALJ's findings. Specifically, spinal imaging suggests only mild abnormalities, as noted by the ALJ (AR 17–19). (*See, e.g.*, AR 330 ("MRI shows very minor

13

degenerative changes in her cervical spine"; "a very small disk protrusion . . . and a slightly larger one" in her thoracic spine; and "a slight rotational angulation of the cord but no overt cord compression"), 345 (MRI shows neurologic symptoms "not consistent with clear pattern of . . . disc herniation"), 417 ("degenerative disc disease," but "minimal bulge" and "no frankly herniated disc or central stenosis"), 822 ("slight disc space narrowing," "joints . . . unremarkable"), 823 ("very slight focal central disc protrusion . . . that does not cause any neural impingement"), 824 ("[d]isc herniations . . . not identified," "thoracic cord is of normal caliber and signal throughout," "[s]table . . . osteophyte formation" causing "some mild mass effect upon the thoracic cord").) Given the relatively unremarkable imaging results, for the most part, Plaintiff's medical sources recommended against surgery, instead suggesting that she pursue more conservative treatment including injections, physical therapy, and pain medication, all of which Plaintiff did undertake, with some success. (*See, e.g.*, AR 449, 611, 674, 792, 828.)

Regarding her need for surgery, Plaintiff consulted with three neurosurgeons, and none of them observed serious abnormalities or advised that surgery was required or likely to improve her condition. Neurosurgeon Nathan Simmons, M.D., recorded in a February 2, 2016 treatment note that surgery was possible but he "d[id] not think [he] could give [Plaintiff] a very high success rate in ameliorating the paraspinal-parascapular pain, which is her biggest complaint," and he warned Plaintiff to "be a little bit cautious in ascribing all of the symptoms to this small lateral herniated disk." (AR 330.) Dr. Simmons stated that he "d[id] not think . . . there [wa]s any pressing issue to have this surgically addressed[,] but . . . she could

do it if she chose to use it as part of her pain management strategy."[1]  (AR 330–31.)

In a June 16, 2016 treatment note, neurosurgeon Paul Penar, M.D., similarly

cautioned against surgery, stating that, given Plaintiff's "intact neurologic[al] status"

and mostly normal objective findings, he "would not recommend aggressive

intervention" including surgery.  (AR 586.)  A third neurosurgeon, Joseph Phillips,

M.D., evaluated Plaintiff on October 4, 2016, recording that Plaintiff was in to see

him "wanting to get more opinions [because] no treatment has been offered."  (AR

613.)  Upon examination and inspection of the relevant MRI scan, Dr. Phillips found

that Plaintiff had "maybe some gross but not terrible areas of tenderness in the

mid[-]thoracic spine[,] and perhaps hyperalgesia [(abnormally heightened sensitivity

to pain)] to pin in the chest wall below the breast on the right side," but her spinal

cord was "not really severely compressed" and she had "excellent" lower extremity

strength.  (AR 614.)  Dr. Phillips opined that "[s]urgery potentially would help

[Plaintiff's] symptoms of radiation to the chest wall" but it "would be hard to predict"

whether surgery would alleviate her other symptoms.[2]  (Id.)  Dr. Phillips referred

Plaintiff to two specialists in Boston who could provide "good insight into the

problem" and "potentially even [perform] surgery" (id.), but Plaintiff later learned

that those specialists did not accept her insurance (AR 774, 800).

---

[1]  About a month later, APRN Dumas recorded in a treatment note that Plaintiff had seen
Dr. Simmons and "he did offer surgery but felt she would not get a great result and she felt he was
trying to dissuade her from surgery."  (AR 447.)

[2]  Dr. Phillips also noted as follows: Plaintiff "may have some mild myelopathic findings
[(neurologic deficits related to the spinal cord)], but there is not a story of progression here, and I don't
believe one ought to force surgery on her with fears that without it she ends up paraparetic [(partially
paralyzed in the lower limbs)]."  (Id.)

Plaintiff ultimately opted against having surgery (AR 828), instead pursuing injections (*id.*; AR 792–95), physical therapy (AR 498–525), and pain medication (AR 460, 757). These relatively conservative treatment measures appear to have reduced Plaintiff's symptoms. (*See, e.g.*, AR 449, 611, 674, 792, 828.) For example, after having an epidural injection in February 2017, Plaintiff noted experiencing better overall functioning, "75% improvement in thoracic pain," and a resolution of radicular symptoms; until she suffered a fall on two different occasions, resulting in more pain. (AR 828.)

Plaintiff claims that, in determining her RFC, the ALJ should not have given more weight to the May 2016 opinions of nonexamining agency consultant Geoffrey Knisely, M.D. (AR 138–39), than to the July 2016 opinions of nonexamining agency consultant Leslie Abramson, M.D. (AR 151–153), and the April 2017 opinions of treating primary care provider APRN Dumas (AR 825–27). Specifically, Plaintiff argues: "The [ALJ] did not adequately explain why he felt Dr. Knisely's medium RFC at [the] initial [stage] was more convincing than Dr. Abramson's light RFC at [the] [r]econsideration [stage], and he did not meaningfully explain why he felt either of th[ose RFCs] was more convincing than that [of] the treating provider, Ms. Dumas." (Doc. 13 at 7.) The Court finds no error.

The regulations clearly permit the opinions of nonexamining agency medical consultants to override those of treating medical sources, when the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563 at 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to

override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). This is so, even in cases like this, where the consultant (Dr. Knisely) has not reviewed the entire record, so long as the consultant's opinions are supported by the record and there is no evidence of a new diagnosis or a worsening of the claimant's condition after the consultant's opinions were made. *See Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d ir. 2016) ("No case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record."); *Charbonneau v. Astrue*, Civil Action No. 2:11–CV–9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012) (where agency consultant opinions are supported by the record and there is no evidence of a new diagnosis or worsening of claimant's condition after the consultant opinions were made, ALJ may rely on them).

The ALJ gave "great weight" to Dr. Knisely's opinions, despite acknowledging that Dr. Knisely had not personally met with or treated Plaintiff. (AR 20.) The ALJ noted that Dr. Knisely had "reviewed the available medical evidence of record," and "cited to [Plaintiff's] daily activities, imaging studies, clinical examinations, nerve conduction studies, . . . relief with medication[,] and conservative treatment," in support of his opinions. (*Id.*) In conducting his analysis of Dr. Knisely's opinions, the ALJ considered the proper factors, concluding that the opinions are "well supported by and consistent with the medical evidence of record." (*Id.*) *See* 20 C.F.R. § 404.1527(c)(3), (4) ("in deciding the weight [to] give to any medical opinion," ALJ

considers several factors including "[s]upportability" and "[c]onsistency"); *id.* at (e)(2)(ii) ("When an [ALJ] considers findings of a State agency medical . . . consultant . . . , the [ALJ] will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as . . . the supporting evidence in the case record").[3] Moreover, the ALJ's findings regarding application of these factors are supported by substantial evidence, as discussed above. (*See, e.g.*, AR 33–34, 259–61, 330, 345, 417, 792–95, 822–24, 828.)

The ALJ properly recognized that agency consultant Dr. Knisely "did not review" APRN Dumas's April 2017 opinions before making his May 2016 opinions, given that Dumas's opinions were made approximately a year after Dr. Knisely's. But the ALJ appropriately found that fact inconsequential, given that APRN Dumas's opinions were entitled to "little weight." (AR 20.) The ALJ gave good reasons for discounting the opinions of APRN Dumas, including that she is not an "acceptable medical source" as defined in the regulations, and her opinions are "not well supported by her own treatment notes or consistent with the medical evidence of record." (*Id.*) As discussed above, supportability and consistency with the record are relevant factors for an ALJ to consider in assessing the weight of medical opinions. *See* 20 C.F.R. § 404.1527(c)(3), (4). Furthermore, it was appropriate for the ALJ to afford less weight to the opinions of Dumas for the reason that she is an advanced

_____

[3] 20 C.F.R. § 404.1527, along with certain other regulations and Social Security Rulings (SSRs) cited herein, has been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). But because Plaintiff filed her claim in January 2016, before the new regulations and SSRs went into effect, the Court reviews the ALJ's decision under the earlier regulations and SSRs, as cited herein.

practice registered nurse and thus not an "acceptable medical source" under the regulations.  *See* 20 C.F.R. §§ 404.1502,[4] 404.1513(a), (d).

The regulations provide that the opinions of "other sources"—including nurse practitioners, physician assistants, and educational personnel, among others—do not require the same special consideration given to treating source opinions, although the ALJ should consider the same factors in evaluating these opinions as are considered in evaluating treating source opinions.  20 C.F.R. § 404.1513(a), (d); *see* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("Information from . . . other sources cannot establish the existence of a medically determinable impairment . . .[;] there must be evidence from an acceptable medical source for this purpose." (internal quotation marks omitted)); *id.* at *5 ("The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source because . . . acceptable medical sources are the most qualified health care professionals." (internal quotation marks omitted)).  The Second Circuit explained that, "while the ALJ is certainly free to consider the opinions of . . . 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008).

---

[4] Like 20 C.F.R. § 404.1527, discussed above, 20 C.F.R. § 404.1502 has been amended, effective March 27, 2017.  The amendment adds as an "[a]cceptable medical source" a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice"; but again, this change applies "only with respect to claims filed on or after March 27, 2017."  20 C.F.R. § 404.1502(a)(7) (citation omitted). Because Plaintiff's claim was filed before that date, the change does not apply to this case.

Here, the ALJ did consider the opinions of APRN Dumas, but reasonably afforded less weight to them, in part because she was not an acceptable medical source. The ALJ's additional finding that Dumas's opinions are not supported by her own treatment notes and are not consistent with the medical evidence of record is also reasonable, and supported by substantial evidence, given that the record—including Dumas's treatment notes—does not suggest that Plaintiff suffered from impairments or pain levels requiring restrictions greater than a medium work level. The record certainly does not support APRN Dumas's extreme opinion that Plaintiff had "no work capacity" during the alleged disability period. (AR 826.) As noted above, an MRI from the same month that Dumas gave that opinion (April 2017) indicated only slight abnormalities (AR 823–24), and an earlier MRI showed normal results except for minimal disc bulge (AR 417). Moreover, as discussed above, Plaintiff's treatment course was relatively conservative, involving mostly medication, physical therapy, and injections, which largely helped. (*See, e.g.*, AR 449, 611, 674, 792, 828.) Although Plaintiff considered surgery, and one physician cautiously supported her going forward with it, two others advised that it would probably not help; and in the end Plaintiff opted against surgery for the various reasons discussed earlier. (*See* AR 330–31, 586, 613–14, 774, 800, 828.)

The ALJ gave "moderate weight" to the July 2016 opinion of agency consultant Dr. Abramson because, "[w]hile her opinion is generally consistent with and supported by the medical evidence of record, Dr. Knisely's opinion provides a more accurate reflection of [Plaintiff's] abilities and limitations." (AR 21.) The ALJ also acknowledged that Dr. Knisely made his opinions before "additional treatment notes

were admitted to the record," but found that fact insignificant because those notes "do not reflect meaningful change in [Plaintiff's] presentation[,] and [Dr. Knisely's] opinion[s] remain[] consistent with the evidence of record in its totality." (AR 20.) Substantial evidence supports these findings. But even if that were not the case, the result would be the same had the ALJ adopted Dr. Abramson's "light work" RFC rather than Dr. Knisely's "medium work" RFC, because the VE testified at the administrative hearing that a hypothetical individual with Plaintiff's RFC could perform her past work as a medical assistant and a sales representative, regardless of whether she had a medium or light work capacity. (AR 21, 54–55.)

Finally, it was proper for the ALJ to consider Plaintiff's daily activities during the alleged disability period in determining her RFC. *See Ortiz v. Astrue*, 875 F. Supp. 2d 251, 258 (S.D.N.Y. 2012) ("In undertaking the RFC analysis, the Commissioner considers all of the relevant medical and other evidence, including the claimant's daily activities[.]" (internal quotation marks omitted)); *see also* 20 C.F.R. § 404.1529(c)(3) (a claimant's "pattern of daily living" is "an important indicator of the intensity and persistence of [the claimant's] symptoms"); *id.* at (c)(3)(i) (listing claimant's "daily activities" as a "[f]actor[] relevant to [claimant's] symptoms . . . , which [the Commissioner] will consider" in assessing claimant's capacity to perform work-related activities); *Lamorey v. Barnhart*, 158 F. App'x 361, 363–64 (2d Cir. 2006) ("Although our independent review of the record confirms . . . that the ALJ somewhat overstated Lamorey's volunteer activities, we nevertheless agree with its conclusion that the record contains substantial evidence of routine activities by Lamorey inconsistent with her claimed total disability."). Those activities include

managing her own personal care, doing light household chores, driving independently, shopping for groceries, and transporting her son to school.  (*See* AR 33–34, 259–261.)

In sum, the record demonstrates that Plaintiff had mild imaging results and relatively normal medical examinations; benefitted from a conservative treatment plan including dietary changes, medication, physical therapy, and injections; and was able to do basic daily activities including routine household chores and food shopping. Moreover, the ALJ gave good reasons for affording little weight to the only treating source opinions in the record, those of APRN Dumas, who is not an acceptable medical source.  The Court finds no error in the ALJ's determination of Plaintiff's RFC.

## III.    ALJ's Failure to Call a Medical Expert at Administrative Hearing

Plaintiff next argues that the ALJ should have called a medical expert at the administrative hearing "based on Plaintiff's atypical spine injury and apparent worsening of her condition."  (Doc. 13 at 7.)  Plaintiff explains that her spinal condition is "uncommon" because "thoracic disc herniations account for less than 1% of all protruded discs."  (*Id.* at 10 n.6 (citing https://www.ucsfhealth.org/conditions/thoracic_disc_herniation/).)

A medical expert (ME) is used primarily in "complex" social security cases "for explanation of medical problems in terms understandable to" the ALJ, who is not a medical professional.  *Richardson v. Perales*, 402 U.S. 389, 408 (1971).  Additionally, an ALJ may "ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the claimant's]

impairment(s) equals the requirements of any [listed] impairment." 20 C.F.R. § 404.1527(e)(2)(iii). Though not binding on the ALJ or the court, it is useful to consider that the Social Security Administration's Hearings, Appeals and Litigation Law Manual (HALLEX) advises as follows: "The need for ME opinion evidence is generally left to the ALJ's discretion," HALLEX I–2–5–32(A) (last update Aug. 29, 2014), and "[t]he primary reason an ALJ will request an ME opinion is to help the ALJ evaluate the medical evidence in a case," *id.* at I–2–5–32 (B).[5] *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) (regulations "provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony"). "When needed, use of an ME will result in a more complete record to support the ALJ's conclusion on the ultimate issue of disability." HALLEX I–2–5–32(B).

The HALLEX Manual indicates that an ALJ "*must* obtain an ME opinion" in the following situations, none of which exist here: (1) the Appeals Council or Federal court ordered an ME opinion; (2) there is a question about the accuracy of medical test results reported, requiring evaluation of background medical test data; or (3) the

---

[5] Although the Second Circuit has not reached the issue, some courts have questioned the precedential value of HALLEX policies. *See, e.g.*, *Harper v. Comm'r of Soc. Sec.*, No. 08-CV-3803 (NGG), 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010) ("[T]he HALLEX is simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner[;] [a] failure to follow procedures outlined in HALLEX, therefore, does not constitute legal error."); *Punch v. Barnhart*, No. 01 Civ. 3355(GWG), 2002 WL 1033543, at *18, n.3 (S.D.N.Y. May 21, 2002) ("[I]t is not clear that a violation of the procedures set forth in the HALLEX Manual is of any independent legal significance."); *Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000) ("HALLEX is a purely internal manual and as such has no legal force and is not binding."). Other courts have found that HALLEX policies have at least some advisory authority. *See Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) ("While HALLEX does not carry the authority of law, this court has held that where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." (internal quotation marks omitted)).

ALJ is considering finding that the claimant's impairment(s) medically equals a

listing.  HALLEX I–2–5–34(A)(1) (last update Apr. 1, 2016) (emphasis added).  The

Manual states that an ALJ "*may* need to obtain an ME opinion" when the ALJ:

- Believes an ME may be able to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing;
- Believes an ME may be able to assist the ALJ by explaining and assessing the significance of clinical or laboratory findings in the record that are not clear; [or]
  . . .
- Has a question(s) about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time[.]

HALLEX I–2–5–34(A)(2) (emphasis added).

Applied here, the ALJ had no obligation to call a medical expert to testify

about Plaintiff's thoracic spine abnormality.  Treating provider APRN Dumas and

nonexamining consultants Drs. Knisely and Abramson each were aware of this

impairment, and they had access to the relevant medical evidence, including for

example, a November 2015 MRI, February 2016 notes from Dr. Simmons regarding

possible surgery, and June 2016 treatment notes from a physician's assistant at

APRN Dumas's office regarding treatment options.  (*See* AR 135, 149, 586–87.)  Even

if Plaintiff's condition "worsen[ed]" since these medical sources made their opinions,

as Plaintiff alleges (Doc. 13 at 7), that would not require the ALJ to call a medical

expert.

## IV.  ALJ's Evaluation of Plaintiff's Subjective Symptoms

Finally, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's

credibility.  (Doc. 13 at 12.)  In that regard, the ALJ stated: "[B]ecause [Plaintiff] has

failed to establish a correlation between the allegations and the objective medical evidence, [I] find[] [that her] symptom[s] are not supported to the extent alleged." (AR 16.) The ALJ explained:

> While at times [Plaintiff] did present as in pain or as unable to sit, this was not her presentation during the majority of office visits and does not reflect her baseline level of functioning. That she does not present with more significant pain behaviors does cut against the persuasive value of her allegations regarding the impact that the pain has upon her ability to function.

(AR 19.)

It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010). Moreover, "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984); *see Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009).

The Regulations set forth a two-step process that the ALJ must follow in evaluating the intensity and persistence of a plaintiff's subjective symptoms. *See*

SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) (describing two-step process).[6]
First, the ALJ must determine whether the record demonstrates that the plaintiff
possesses a "medically determinable impairment that could reasonably be expected to
produce [the claimant's] symptoms, such as pain." 20 C.F.R. § 404.1529(b).
Second, the ALJ must assess the reliability of the plaintiff's complaints regarding
"the intensity and persistence of [the plaintiff's] symptoms" to "determine how [those]
symptoms limit [the plaintiff's] capacity for work." 20 C.F.R. § 404.1529(c). In
making this assessment, the ALJ should consider factors relevant to the plaintiff's
symptoms, such as pain, including: (1) the plaintiff's daily activities; (2) the "location,
duration, frequency, and intensity of pain or other symptoms"; (3) any precipitating
or aggravating factors; (4) the "type, dosage, effectiveness, and side effects of any
medication" taken by the plaintiff to alleviate his or her pain or other symptoms;
(5) "[t]reatment, other than medication," that the plaintiff has received for relief of
pain or other symptoms; (6) any other measures the plaintiff has used to relieve
symptoms; and (7) "[a]ny other factors concerning [the plaintiff's] functional
limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL
5180304, at *7–8.

    Here, the ALJ clearly considered the entire case record in evaluating Plaintiff's
allegations of symptoms, and adequately explained his reasons for finding that these
allegations were "not fully persuasive." (AR 17.) Specifically, the ALJ explained that

_____

        [6] The regulations and sub-regulatory policy no longer use the term "credibility," since
"subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017
WL 5180304, *2. "Instead, [the Commissioner] will more closely follow [the applicable] regulatory
language regarding symptom evaluation." *Id.*

the objective medical evidence and medical provider treatment notes (discussed and cited above) indicate that Plaintiff's symptoms and limitations were not as severe as alleged. (AR 17–20.) Moreover, the ALJ noted that Plaintiff opted not to pursue surgery and reported relief after employing conservative treatment including pain medication, injections, and physical therapy. (AR 17–18; *see, e.g.*, AR 611, 792, 828.) Regarding daily activities, the ALJ accurately stated:

> [Plaintiff] engages in daily activities such as household chores, watching television, using the computer, reading, and puttering. She noted that she reads novels and medical journals. In a function report, [Plaintiff] noted [that] she has no difficulty with personal care[;] that she is able to prepare meals but tends to do take[-]out or delivery[;] that she is able to dust, do the laundry, do the dishes, and clean if she has help vacuuming and carrying items up[]stairs[;] and that she leaves the house daily. She is able to shop for groceries 2–3 times per week for up to 45 minutes at a time, manage her finances, go out to lunch, and pay attention adequately.

(AR 19–20; *see, e.g.*, AR 33–34, 259–62.) The ALJ also noted that Plaintiff is "able to attend appointments as scheduled and arrive on time." (AR 19.) Plaintiff claims this finding is false (*see* Doc. 13 at 13 n.8), given Plaintiff's testimony at the administrative hearing that "[t]here [have] been some issues with [her] getting [her son] to school on time," and the school even "filed a report with [the Department of Children and Families] because of [her son's] excessive tardiness" (AR 34). The argument fails, however, given Plaintiff's testimony in the next breath that the tardiness never exceeded five minutes. (*Id.*)

Plaintiff further claims that the ALJ should have noted Plaintiff's reports that she lay down several times per day, napped twice daily, hired someone to do her heavy household chores, and required help carrying the bags and placing items in and taking items out of the cart when grocery shopping. (Doc. 13 at 13–14.) But

"[a]n ALJ does not have to state on the record every reason justifying a decision."

*Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). Nor is an ALJ "required

to discuss every piece of evidence submitted," and "[a]n ALJ's failure to cite specific

evidence does not indicate that such evidence was not considered." *Id.* (internal

quotation marks omitted). The Court is mindful that "'a claimant need not be an

invalid to be found disabled' under the Social Security Act." *Balsamo v. Chater*,

142 .3d 75, 81 (2d Cir. 1998) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir.

1988)). And Plaintiff did testify to difficulties with many of her activities: for

example, she stated that she could do only light household chores and only "in small

steps" (AR 33), that her teenage son helps with the chores (AR 48), that she hired a

housecleaner to complete the heavier household chores (*id.*), that her sister

accompanied her grocery shopping and they made frequent stops (*id.*), that she often

picked up dinner at drive-through restaurants to avoid having to prepare meals (AR

33), and that she sometimes had flares of pain that prevented her from getting out of

bed for over an hour (AR 40). But in general, substantial evidence supports the

ALJ's conclusions about Plaintiff's daily activities.

The ALJ's rationale for his evaluation of the intensity and persistence of

Plaintiff's symptoms is supported by substantial evidence; and it was legally proper

for the ALJ to consider the factors considered. *See, e.g.*, 20 C.F.R. § 404.1529(c)(3)(i)

(listing daily activities as a relevant consideration in assessing credibility); *Cichocki*

*v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ properly considered claimant's daily

activities, such as walking her dog and cleaning her house, in support of RFC

determination).  Given the limited scope of judicial review on this issue, there is no reason to disturb the ALJ's evaluation of Plaintiff's subjective symptoms.

## Conclusion

For these reasons, the Court DENIES Plaintiff's motion (Doc. 13), GRANTS the Commissioner's motion (Doc. 14), and AFFIRMS the decision of the Commissioner.  The Clerk shall enter judgment  in favor of the Commissioner.

Dated at Burlington, in the District of Vermont, this 23rd day of July 2019.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge